**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**JASON BROWNING,**

          *Plaintiff,*

v.                                     **CIVIL ACTION NO. 1:13-cv-23
                                      (JUDGE KEELEY)**

**NICKI SEIFERT ET AL.,**

          **Defendants.**

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On February 11, 2013, *pro se* Plaintiff Jason Browning ("Plaintiff") filed a Complaint initiating this civil rights action pursuant to 42 U.S.C. § 1983. (ECF No. 1). On that same date, Plaintiff was sent a Notice of Deficient Pleading which advised him that he must file his Complaint on the Court-approved form. (ECF No. 6). On February 25, 2013, Plaintiff filed his Complaint on the Court-approved form. (ECF No. 9). In the Complaint, Plaintiff sought relief against Unit Manager Nicki Seifert ("Seifert"); Unit Manager Brandi Miller ("Miller"); Associate Warden of Programs ("A.W.P.") Greg Yahnke ("Yahnke"); Warden Evelyn Seifert ("E. Seifert"); Chaplain Michael Taylor ("Taylor"); Religious Coordinator C.J. Ryder ("Ryder"); Commissioner of the West Virginia Division of Corrections, James Rubenstein ("Rubenstein"); Kitchen Supervisor Bob Yocum ("Yocum");[1] and Commissary Supervisor Mary Ann Workman ("Workman"). (*Id.*). Defendant

---

[1] Defendant Yocum states his name is incorrectly spelled in the Complaint and throughout. The correct spelling should be "Yocum" not "Yokum." For purposes of this Order, the Court will use the corrected spelling of Yocum.

Yocum filed a Motion to Dismiss on May 2, 2013. (ECF No. 32). Defendants Seifert, Miller, Yahnke, E. Seifert, Taylor, Ryder and Rubenstein filed a Motion to Dismiss on May 2, 2013. (ECF No. 35). Defendant Workman filed a Motion to Dismiss on July 2, 2013. (ECF No. 48).

On May 3, 2013 and July 8, 2013, Magistrate Judge Seibert issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of his right to file a response and that a failure to respond could result in the entry of a dismissal order against him. (ECF No. 38, 50). Plaintiff filed a Response in Opposition to Defendants' Motions to Dismiss on May 16, 2013. (ECF No. 42). Plaintiff filed a Response in Opposition to Defendants' Seifert, Miller, Yahnke, E. Seifert, Taylor, Ryder, Rubenstein, and Yocum Motions to Dismiss on June 10, 2013. (ECF No. 47). Plaintiff filed a Response in Opposition to Defendant Workman's Motion to Dismiss on August 9, 2013. (ECF No. 59). Defendants Seifert, Miller, Yahnke, E. Seifert, Taylor, Ryder and Rubenstein replied on July 19, 2013. (ECF No. 53). Defendant Workman replied on July 26, 2013.(ECF No. 55).

Plaintiff filed a Motion for Preliminary Injunction on July 26, 2013. (ECF No. 56). Defendants Seifert, Miller, Yahnke, E. Seifert, Taylor, Ryder, and Rubenstein filed a Response to Motion for Preliminary Injunction on August 30, 2013. (ECF No. 60). Defendant Workman filed a Response to the Motion for a Preliminary Injunction on August 30, 2013. (ECF No. 61).

On January 28, 2014, Magistrate Judge Seibert issued a Report and Recommendation ("R&R") which recommended that Yocum's Motion to Dismiss or, in the alternative, Motion for Summary Judgment be granted because he did not have sufficient personal involvement in the alleged violations of Plaintiff's civil rights. In addition, the R&R recommended that Workman's Motion to Dismiss be granted because Plaintiff's complaint failed to state a claim for relief against her. The R&R also recommended that Plaintiff's Motion for Preliminary Injunction be denied. As

well, the R&R recommended that the Motion to Dismiss filed by Seifert, Miller, Yanke, E. Seifert, Taylor, Ryder and Rubenstein be denied, and those Defendants be ordered to answer the Complaint. Finally, the R&R ordered counsel for Seifert, et al., to file a written memorandum explaining how Eleventh Amendment immunity applies to an action filed in federal court. (ECF No. 66).

Defendants Seifert, Taylor, Miller, E. Seifert, Rubenstein, Ryder and Yanke objected to the R&R contending that the magistrate judge had erroneously concluded that they were not entitled to Eleventh Amendment immunity and that Plaintiff had exhausted his administrative remedies. (ECF No. 69). Plaintiff did not file objections to the R&R despite having been forewarned that his failure to do would result in a waiver of his appellate rights as to any issues not decided in his favor. Following a *de novo* review of the portions of the R&R to which Defendants objected, the Court found that the objections were without merit. Accordingly, the District Judge adopted the R&R in its entirety and dismissed Plaintiff's Complaint as to Yocum and Workman. In addition, the District Judge denied Plaintiff's Motion for Preliminary Injunction and denied the Motion to Dismiss filed by Seifert, Taylor, Miller, E. Seifert, Rubenstein, Ryder and Yahnke and ordered those Defendants to answer the Complaint. (ECF No. 71).

On March 28, 2014, the remaining Defendants filed an Answer to the Complaint. (ECF No. 74). On April 1, 2014, a First Order and Notice Regarding Discovery and Scheduling was entered. (ECF No. 78). On April 28, 2014, Defendants were granted leave to take the deposition of Plaintiff. (ECF No. 85). On July 7, 2014, Plaintiff filed a Motion for an Order Compelling Discovery. (ECF No. 98). Said Motion was denied on September 10, 2014, because Plaintiff failed to comply with the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure. (ECF No. 114).

On August 22, 2014, Defendants filed a Motion for Summary Judgment. (ECF No. 103). On

September 5, 2014, Plaintiff filed four Responses to Defendants' Motion for Summary Judgment and attached documents in support of each Response. (ECF Nos. 105-108). On September 16, 2014, Defendants filed a Reply to Plaintiff's Responses (ECF No. 118).

## II.   CONTENTS OF THE PARTIES

### A.   *The Complaint*

In his Complaint, Plaintiff alleges that Defendants have violated his First Amendment right of free exercise of religion and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by:  (1) denying him a kosher diet; (2) denying him religious apparel; and (3) denying him the right to worship weekly or on special holidays. (Compl. at 4, ECF No. 9).[2] Plaintiff also states that his Sixth Amendment and Eighth Amendment rights have been violated but does not allege specific facts in furtherance of these claims. (ECF No. 9 at 9).

### B.   *Defendants' Motion for Summary Judgment*

Defendants argue, as more fully discussed in their memorandum of law, that some of Plaintiff's claims brought under RLUIPA are moot pursuant to *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006) because there are instances when no burden has been placed upon Plaintiff's ability to practice his religion. Moreover, Defendants argue that where a burden does exist, the same is present due to numerous institutional safety, financial and logistical concerns. Finally, Defendants argue that numerous accommodations[3] have been made for Plaintiff.  Accordingly, Defendants argue that the burdens imposed upon Plaintiff were in furtherance of compelling governmental interests and were

---

[2] The Court utilizes the page numbering of the document filed using CM/ECF when referring to Plaintiff's Complaint.

[3] The undersigned has searched the record and can find no examples of accommodations made to Plaintiff.

the least restrictive means of accomplishing the same. Beyond their arguments regarding RLUIPA, Defendants maintain that the Eleventh Amendment precludes suit against the State in federal court and they are entitled to qualified immunity as they broke no laws in performing their duties.

## C. Plaintiff's Responses

With respect to Miller, Plaintiff alleges that she played an even bigger role than N. Seifert (Unit Manager) and Yanke (Assistant Warden Programs) in having him locked up for wearing his yarmulke. With respect to Taylor, Plaintiff alleges that he lied in responding to interrogatories. Specifically Plaintiff alleges that Taylor lied about following "Policy," because the policy says that Orthodox Jewish inmates can wear their yarmulke at all times. He also claims that Taylor lied when he said Plaintiff never submitted any requests to purchase kosher foods. With respect to Rubenstein, Plaintiff alleges that in answering an interrogatory, he responded "see contracts," but no contract was provided. Plaintiff further alleges that he never received a non-flesh diet tray. Finally, with respect to Ryder, N. Seifert, E. Seifert and Yanke, Plaintiff alleges that he has "evidence" on said Defendants. However, he does not indicate what that evidence is nor does he attach anything that pertains to those Defendants.

## D. Defendants' Reply

Defendants reiterate the relevant facts and procedural history. They then address each one of Plaintiff's Responses and note that the entirety of the same is comprised of self-serving, speculative and unsubstantiated statements. Accordingly, Defendants contend that Plaintiff has failed to create any genuine issues of material fact. Furthermore, they allege that the attachments to Plaintiff's Responses also fail to create any genuine issue of material fact.

### III.   STANDARD OF REVIEW

#### A.      *Motion for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends upon the substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The Court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P 56(c).

Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party. *Miller v. Fed. Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir. 1990). In applying the standard for summary judgment, a court must review all the evidence "in the light most favorable to the nonmoving party." *Celotex Corp.*, 477 U.S. at 322-23. The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. *Anderson*, 477 U.S. at 248.

In *Celotex*, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. *Id.* This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. *Id.* at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. *Anderson*, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587 (citation omitted).

**C.    42 U.S.C. §1983**

42 U.S.C.§ 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage.....subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights...secured by the Constitution and laws, shall be liable to the party injured in any action at law...or suit in equity.

Therefore, the initial inquiry in a § 1983 case is as follows: (1) was the conduct complained of committed by a person acting under the color of state law and (2) did that conduct deprive the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995); *Harvey v. Harvey*, 949 F. 2d 1127, 1130 (11th Cir. 1992).

Whether a constitutional right is alleged to have been violated is usually clear, but the under color of law requirement has been subject to more debate. "As a general rule, 'a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988)); *see also Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 936 n.18 (1982) (finding that "state employment is generally sufficient to render the defendant a state actor"). Accordingly, any person acting with a badge of authority given to them by virtue of their position with the state who violates a person's constitutional rights is subject to liability for the unconstitutional act. *See West,* 487 U.S. at 49 *(citing United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Monroe v. Pape*, 365 U.S. 167, 187 (1961).

**D.      *First Amendment: Free Exercise Clause Violation***

Prisoners retain their constitutional rights to freedom of religion pursuant to the First Amendment. *See Turner v. Safley*, 482 U.S. 78, 84 (1987) (stating that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."). As such, prisoners must be given "reasonable" opportunities to practice their religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). However, the Supreme Court has further cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." *Lovelace v. Lee,* 472 F.3d 174, 199 (4th Cir. 2006) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Thus, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." *Lovelace,* 472 F.3d at 199 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-50 (1987); *Turner*, 482 U.S. at 84-85).

In order to achieve this deference, in part, the Supreme Court revisited the level of scrutiny applied to constitutional claims raised by people currently incarcerated. The Supreme Court thus held that when an incarcerated person alleges a prison regulation or policy violates their constitutional rights, the "regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (defining the appropriate standard as requiring rational basis, not strict scrutiny analysis). In lowering the standard of review, the Court reasoned that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.*

The *Turner* court laid out four factors for the court to consider when "determining the reasonableness of the regulation at issue." *Id.* The test asks:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

*Lovelace,* 472 F.3d at 200 (*citing Turner*, 482 U.S. at 89–92 (internal quotation marks and citations omitted)). Therefore, when determining the reasonableness of a prison regulation, the court must apply this four factor *Turner* test.

**E.      RLUIPA, 42 U.S.C. §§ 2000cc et seq.**

Plaintiff also alleges a statutory claim under RLUIPA. Congress enacted RLUIPA in 2000 "because it found that some prisons have restricted religious liberty 'in egregious and unnecessary ways.'" *Lovelace*, 472 F.3d at 182 (*citing* 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Thus, RLUIPA guarantees incarcerated people greater freedom to engage in religious conduct than does the First Amendment. According to RLUIPA, a government is prevented from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1; *see also Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) (upholding RLUIPA's constitutionality). In sum, RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter*, 544 U.S. at 718.

When analyzing a claim under RLUIPA, the court must determine whether the government program or activity at issue receives federal financial assistance. *See* 42 U.S.C. § 2000cc-1(b)(1).[4] When analyzing the substance of the claim, the burden of persuasion is on the plaintiff to demonstrate that the "government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." *Id.* § 2000cc-2(b). Under RLUIPA, "religious exercise" is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). Once the court determines whether the plaintiff's claim involves a "religious exercise," then the court must assess whether the burden was "substantial." *Id.* § 2000cc-

---

[4] RLUIPA also applies in a case when "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc-1(b)(2).

2(b). The Fourth Circuit followed the Supreme Court's guidance in First Amendment Free Exercise Clause cases and found that "for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425 (1981)).

Once the plaintiff demonstrates that a government practice substantially burdens their exercise of religion, the burden shifts to the defendant to show that the government practice or policy is "the least restrictive means of furthering a compelling government interest." *See Lovelace*, 472 F.3d at 189. When applying the "compelling government interest" standard, the court must consider the "context" of the claim and apply the standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 189-90 (citing *Cutter*, 544 U.S. at 723). The court is to pay particular consideration to security concerns. *Id.* Moreover, RLUIPA is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.*

## IV.  DISCUSSION

There appears to be no dispute that Plaintiff is a convicted felon who is in the custody of the West Virginia Division of Corrections ("WVDOC"). In addition, there appears to be no dispute that Plaintiff was incarcerated at the Northern Correctional Center ("NCC")[5] from October 2008, until

---

[5]Defendants refer to it as the Northern Correctional Center, while the WVDOC website lists this institution as the Northern Correctional Facility. For ease, the undersigned will use Northern Correctional Center or "NCC." Regardless of its title, Plaintiff was clearly housed at a facility located in Moundsville, West Virginia which is called the Northern Regional Jail and Correctional Facility. According to WVDOC website, "[t]his facility is 'unique' in the respect that it is two separate and distinct entities, a Correctional Facility under the direction of the West Virginia Division of Corrections and a Regional Jail under the direction of the Regional Jail Authority. The Northern Correctional Facility, which is a Level V

sometime in July of 2014, when he was transferred to the Mount Olive Correctional Complex ("MOCC"). (ECF Nos. 9 & 101). Plaintiff is currently housed at the Huttonsville Correctional Center ("HCC"). Defendants do not appear to contest that Plaintiff is "Jewish . . . by blood" (ECF No. 9-6 at 5) nor that his desire to adhere to the tenants of Orthodox Judaism[6] is a sincerely held religious belief. Finally, because RLUIPA guarantees incarcerated people greater freedom than does the First Amendment, the undersigned has restricted his analysis of Defendants' Motion for Summary Judgment to the dictates of RLUIPA.

As previously noted, Plaintiff alleges three broad areas in which Defendants have violated his religious rights under RLUIPA. To reiterate, they are: (1) being denied a religious diet; (2) being denied the ability to wear religious apparel and possess various items; and (3) being denied the right to worship in weekly services and on special holidays. Before addressing these claims as they relate to his incarceration at the NCC, the undersigned believes it appropriate to address Plaintiff's current "dietary status" at HCC. As previously noted, Plaintiff was transferred to MOCC sometime prior to July 25, 2014, when he filed a Notice of Change of Address. (ECF No. 101). He was then transferred to HCC, sometime prior to October 1, 2014, when he filed another notice of change of address. (ECF No. 119). Unlike the NCC, both MOCC and HCC are facilities operated solely by the WVDOC.

On May 1, 2014, Policy Number 511.00 was issued by the WVDOC. The subject of the Policy is "Religious Special Diet." Pursuant to this Policy, only one religious special diet will be

_____

(Maximum Security) Correctional Facility, . . . houses approximately 253 male inmates, some in double bunked cells, who have been convicted of serious offenses against persons and property or are special management cases." *See* www.wvdoc.com.

[6]There are several branches of Orthodox Judaism. They include: (1) Traditional; (2) Centrist/Modern/Cosmopolitan; (3) Yeshivish; and Dati/Chareidi. *See* www.jewishvirtuallibrary.org. Plaintiff does not indicate to which branch he belongs.

created or served; meat is never an item in the religious special diet. Moreover, the Policy acknowledges that the religious special diet is not intended to provide everything an inmate of any faith can eat. However, it is intended to provide a nutritionally adequate meal that meets dietary restrictions imposed by various beliefs. Of significance to Plaintiff, the Policy defines koshered as follows:

> to make proper or ritually pure. In order to prepare meals, and any counter or surface the food comes in contact with must be koshered or the food will be rendered (TREIF) or no longer kosher. In order to render kitchen utensils and/or cooking surfaces koshered, the item used must be submerged completely in a vessel that contains boiling water.

(ECF No. 104-1 at 18). The Policy further provides that:

**FOOD ITEMS**

1. The entree for the Religious Special Diet may be purchased from a recognized vendor with appropriate Kosher and/or Halal[7] certifications. The Food Service Vendor will maintain current certifications. The product label for the entree shall display the appropriate certification symbol(s). Copies of all current certifications shall be maintained in the Food Service Area and in Administration offices.

2. Cereal used in the religious special diet program may be purchased in bulk. The packaging shall display the appropriate certification symbol(s).

3. The breads used in the religious special diets and used at each meal shall display the appropriate certification symbol(s). The required number of slices (portion) is to be taken from the original packaging and placed on the appropriately colored tray during serving as needed.

4. Fresh whole fruit and vegetables are to be broken when necessary to accomplish the proper serving size. Knives are not used in order to avoid treif contamination or violation of proper kosher food preparation.

5. Peanut butter, cream cheese, jelly, juice and other items used daily shall display the appropriate certification symbol(s). It is recommended, where economically feasible, to purchase products individually packaged which display the appropriate

---

[7]"In Arabic, the word *halal* means permitted or lawful. Halal foods are foods that are allowed under Islamic dietary guidelines." http://mideastfood.about.com.

certification symbol(s).

6.   The serving trays, bowls, eating utensils, etc., are to be color coded for the Religious Special Diet.  A sufficient quantity of paper/Styrofoam products and individually wrapped spoons and forks should be maintained on hand for use during a lockdown, natural disaster, or other planned or unplanned event.

7.   Specific handling requirement shall be addressed by the Food Service Vendor. The Food Service Vendor will train appropriate staff and inmate food service workers in proper Kosher Food Handling procedures. Current signed training forms on the handling requirements will be maintained on site by the vendor with a copy of the signed form going to the Warden/Administrator/Designee.

8.   The food handling instructions for the religious special diet will be prominently displayed in the religious special diet preparation area(s).

9.   Food stuffs and preparation and serving a utensils/equipment shall be appropriately stored in specifically designated areas.

**EQUIPMENT**

1.   The purpose of providing and using separate cooking, serving, and eating utensils is to avoid cross contamination of foods. These items are to be used only for the religious special diet without exception.

2.   Each item is to be distinctively and permanently marked for use with the religious special diet only.

3.   Equipment for the religious special diet is to be stored separately in the respective locker box, secure cabinet, or other specifically designated secure location. Food Service Staff and/or Correctional Staff are the only ones authorized to retrieve from or place items in these secure areas.

4.   The Food Service Contractor shall provide a required equipment list needed to prepare and serve the Religious Special Diet.

5.     When necessary, the WVDOC will request the services of a Rabbi to perform the ritual cleansing/sanctifying ceremony (kashering ceremony) for the designated utensils.

6.     Replacement utensils and items improperly used will be ritually cleansed sanctified as well.

It would appear that this Policy Directive, if followed, insures that food prepared in the

kitchens at WVDOC facilities are prepared according to kosher standards. However, Defendants have provided no proof that the Policy has been implemented and is being followed at either MOCC or HCC. Moreover, as discussed more fully below, the kitchen at the NCC is not under the supervision of WVDOC, but instead is governed by the policies and procedures of the West Virginia Regional Jail Authority. There is no guarantee that Plaintiff will be reassigned to the NCC at some time in the future and no guarantee that food preparation at that facility will meet kosher standards. Accordingly, although Defendants argue that Plaintiff's claim in this respect is moot, the undersigned finds insufficient verification to recommend that Plaintiff's claim for injunctive relief regarding kosher meals from the prison kitchen be declared moot at this time. Therefore, Defendants' Motion for Summary Judgment as to this issue is denied.

**A. Kosher Diet**

As previously noted, the NCC is unique in that it is housed within the Northern Regional Jail ("NRJ"). The NRJ is a component of the West Virginia Regional Jail and Correctional Facility Authority ("WVRJA") , while the NCC is a component of the WVDOC.[8] (ECF No. 104-1 at 2). The kitchen at this "joint" facility currently operates through a contract between the WVRJA and Trinity Services Group. Prior to March 31, 2014, when Plaintiff was housed there, the contract was between the WVRJA and Aramark. Consequently, the WVDOC has never been part of the food service contract which dictates the food provision and preparation at NCC. Moreover, because the NCC is housed at the NRJ, the policies and procedures of the WVRJA govern the operation of the kitchen and the means and methods by which food is prepared for inmates of the WVDOC. (ECF No. 104-1 at 2-3).

---

[8] This is the only facility in West Virginia which has both a regional jail and a correctional center.

The undersigned does not believe that this "unique" arrangement, in and of itself, relieves Defendants of liability. Instead, consideration must be given to the standards set forth in RLUIPA. In so doing, the undersigned has relied on a case with similar facts that was decided by the United States District Court of Maryland and subsequently affirmed by the Fourth Circuit in a *per curiam* opinion.

In May of 2005, Steven Wilkerson, an inmate housed at Western Correctional Institution, filed a complaint alleging that his requests for kosher meals were denied and the vegetarian diet option provided by the Maryland Department of Correctional Services did not meet the criteria for a kosher Jewish meal. *See Wiilkerson v. Beitzel*, No. JFM 05-1270, 2005 WL 5280675 (D. Md. Nov. 10, 2005), *aff'd* 184 F. Appx. 316 (4th Cir. 2006). The court concluded that the defendants presented considerable evidence to show a violation of RLUIPA did not occur. *See id.* at 13-14. These government interests included the following: (1) additional costs associated with providing religion specific meals to inmates; (2) perceived favoritism for any one religious group which may encourage litigation against the Maryland DOC; (3) and the interference of batch processing of meals by the kitchen. *See id.* at 3-4. In addition to these legitimate governmental interests, the court also noted that the meals plans available to the plaintiff and other inmates were neutral in religious requirements and were the least restrictive means available to advance the compelling interest in avoiding perceived favoritism between religious groups. *See id.* at 14.

At the time Plaintiff was incarcerated at the NCC, the kitchen at the NRJ prepared food for approximately 1000 inmates three times a day. (ECF No. 104-1 at 2). The preparation of an individual kosher meal and utilization of different cooking utensils would have interfered with the batch processing of these 3000 daily meals. Moreover, if Plaintiff were provided a kosher diet, the

NRJ kitchen would have to prepare religious specific meals for every different religion to avoid any perceived favoritism. Again, such action would have interfered with the batch processing of the 3000 daily meals. Moreover, there would have been added expense to provide the appropriate storage of the food and utensils needed to prepare kosher meals.

From November 19, 2008 to March 21, 2011, Plaintiff received a "no pork" diet. (ECF No. 104-1 at 4). On March 21, 2011, Plaintiff switched to a "no flesh" diet. (*Id.*). The "no pork" diet was the same diet received by Jewish and Muslim inmates who requested the same. (*Id.*). The "no flesh" diet was the same diet received by Jewish, Hare Krishna, Buddhist, Hindu, and Seventh-Day Adventist inmates who requested said diet. (*Id.*). Accordingly, the meal Plaintiff received was neutral in religious requirements.

The undersigned accepts that Plaintiff's inability to receive a kosher meal from the kitchen at the NRJ/NCC placed a substantial burden on the exercise of his religion. However, the difficulties that would have ensued in providing a kosher meal to at most two inmates,[9] including additional costs, interference with preparation of batch meals and creation of perceived favoritism between religious groups, are legitimate compelling interests that override the burden placed on Plaintiff's ability to receive an institutionally prepared kosher meal. Accordingly, the undersigned finds that Plaintiff has failed to establish a RLUIPA violation with respect to kosher meals at the NCC.

In his prayer for relief, Plaintiff grouped several requests that fall under Plaintiff's claim that he was denied a kosher diet. Specifically, he made the following requests:

1. I would ask for my kosher diet and proper kosher meals;

2. I would like my kosher food shipped to me from Aramark;

---

[9]A review of the Affidavit of Michael E. Taylor, the Chaplain at the NCC, indicates that while Plaintiff was at the NCC, there was only one other Jewish inmate. (ECF No. 104-1 at 7).

3. I would like to work in the kitchen so I can prepare my food properly, or have someone trained who can;

4. Separate cooking utensils specifically used for my kosher food preparation;

5. To order a monthly package from Aleph Institute[10];

6. A microwave for Jewish inmates to stay kosher;

7. The Keefe store list to [be] adjusted to specify kosher foods so Jewish inmates will no [sic] if their [sic] buying kosher or non-kosher; and

8. The Keefe store to sell kosher meats, bread, soups, juice, or soda.

(ECF No. 9 at 117-18).

Plaintiff's requests numbered one, three and four fall into the discussion regarding Plaintiff's receipt of kosher meals from the kitchen at the NCC and need not be addressed further.

Plaintiff's request number two is that he would like his kosher food shipped to him from Aramark. In response to this request, Defendants first note that Aramark is not currently the food service provider at the NCC. In addition, they note that for "the food service provider" to ship kosher foods to Plaintiff would also require said entity to ship religion specific meals to any inmate who requests a specific religious diet. They allege that this was not and is not feasible from a financial and logistical standpoint. (ECF No. 104 at 21). Plaintiff's request number five is to order a monthly food package from the Aleph Institute. In response to this request, Defendants have provided an affidavit from Michael Taylor, the chaplain at the NCC, which indicates that he "set up an order for [Plaintiff] from the Aleph Institute on occasion. [Plaintiff] chose to decline the order

---

[10]According to its website, the Aleph Institute is located in Surfside, Florida, which for over thirty years has been serving society by: (1) providing critical social services to families in crisis; (2) addressing the pressing religious, educational, humanitarian and advocacy needs of individuals in the military and institutional environments; and (3) implementing solutions to significant issues relating to our criminal justice system, with an emphasis on families, faith based rehabilitation and preventive ethics education. http://aleph-institute.org/about-us.html

as he did not wish to pay for the same." (ECF No. 104-1 at 4). Accordingly Defendants argue that no one, other than Plaintiff, is preventing him from receiving an order from the Aleph Institute. (ECF No. 104 at 22).

The undersigned finds these responses puzzling. Contained in the attachments to Plaintiff's original Complaint is a memorandum dated July 31, 2012 from Gregory L. Yanke, Associate Warden of Programs. It reads: "Your request to purchase foods through Aleph Institute is denied. You have been offered an alternative; Aramark is willing to work with you to order kosher meals when the general population inmates order 'Fresh Favorites' meals." (ECF No. 1-7 at 2).[11] Clearly, if the kitchen could not provide Plaintiff with kosher meals, the ability to purchase meals from the food service provider or obtain food from an independent service would have provided Plaintiff with some kosher food. Given the inconsistent responses contained in the record, summary judgment is not appropriate on the issue of ordering kosher food.

Plaintiff's request number six is for a microwave for Jewish inmates to stay kosher. In response to this request, Defendants allege that a request for a microwave is financially unreasonable as the same would require the WVDOC to install religion specific microwaves in every cell pod in every institution in the state. This response is inconsistent with AWP Yanke's memorandum noted above. The pre-packaged Halal/Kosher entrees that were available from Aramark were fully cooked single serving entrees in microwavable trays. (ECF No. 1-7 at 5).[12] Therefore, Defendants' response,

---

[11]Plaintiff's original complaint consisted of fourteen typed pages and 78 pages of attachments. It was not returned to him with the Notice of Deficient Pleading. Plaintiff's Complaint on the Court-approved form consists of 20 handwritten pages with 59 pages of attachments. Although substantially similar, there are differences in the Complaints and attachments. Because the memorandum cited herein was generated by one of the Defendants, the undersigned believes it appropriate to consider it in this R&R.

[12] The entirety of Plaintiff's attachment 7 to his original Complaint is missing from his Complaint on the Court-approved form. However, all of the pages in that attachment are forms and or correspondence that should be in Defendants' possession.

without further explanation, fails to give a justifiable reason for denying Plaintiff's request. Accordingly, summary judgment on this issue is not appropriate

Plaintiff's final two requests under the broad topic of kosher diet are for the Keefe store list to be adjusted to specify kosher foods and for the Keefe store to sell kosher meats, bread, soups, juice or soda. Defendants respond that despite the existence of a contract with Keefe, the WVDOC cannot dictate what is sold by Keefe or how Keefe labels its products. (ECF No. 104 at 2). Therefore, it appears Defendants were prevented from granting Plaintiff's request, and thus, summary judgment would be appropriate.

### B. Religious Apparel and Items

In his Complaint, Plaintiff alleges that he has been denied "religious apparel." (ECF No. 1 at 4). Although apparel is commonly defined as clothing, Plaintiff has included in his prayer for relief, various items which leads the undersigned to conclude that Plaintiff is alleging that he has been denied various items of clothing, religiously significant objects and the ability to follow certain grooming practices. Specifically, Plaintiff requests the following for relief:

1. Permission to wear my yarmulke at all times;

2. Herbs, oils, and incense for services only;

3. Two-prayer shawls;

4. Wear religious clothing, such as a tallit, tzitzit, and yarmulke during administrative or disciplinary segregation;

5. Candles and a menorah for Chanukkah[13];

6. Jewish holiday cards for each holiday that Keefe does not sell;

---

[13]It appears that Plaintiff has blended the spelling of Hanukkah or Chanukah which commemorates the rededication of the Second Temple in Jerusalem. http://www.history.com/topics/holidays.

7. A Jewish newspapers such as the "The Jerusalem Press";

8. Proper utensils used in the worship services[14];

9. A new copy of the Torah in Hebrew;

10. Tallit bag to keep my prayer shawls, and Torah, tefflin, tallit and all my religious things;

11. To have a sukkoth booth each year to celebrate daily [and] recite blessings over plant species (a lula, a palm branch, an etrog, a citron, and a willow;

12. A locker box designated for Jewish material at the chaplin [sic] office like all other religions, but orthodox Jew;

13. A depilatory, this is a cream to remove unwanted hair; and

14. Refrain from shaving, cutting hair, beard or earlocks.

(ECF No. 9 at 17-18).

Defendants are entitled to summary judgment with respect to many of these requests. First, to the extent that Plaintiff believes that the WVDOC must provide him with specific items of religious significance, he misunderstands the purpose of RLUIPA. A prison is not required "to pay for an inmate's devotional accessories." *Cutter*, 544 U.S. at 720 n. 8 (citing *Charles v. Verhagen*, 247 F.3d 601, 605 (7th Cir. 2003) (overturning a prison prohibition on the possession of Islamic prayer oil, but placing the responsibility for purchasing the oil on the prisoner.)). Therefore, Defendants are entitled to summary judgment with respect to Plaintiff's request for: (1) herbs, oils or incense;[15] (2) two prayer shawls; (3) candles and a menorah for Chanukah; (4) Jewish holiday

---

[14] During his deposition, Plaintiff indicated that, in part, he was referring to a bowl and a towel to be used during holiday services. (ECF No. 104-1 at 13).

[15] In the exhibits attached to Defendants' motion for summary judgment, there is an affidavit from Michael E. Taylor, the Chaplain at the NCC. It states in paragraph 8, that "[u]pon information and belief, herbs, oils, and incense are not needed for Orthodox Jewish religious worship services. (ECF No. 104-1). However, the undersigned's review of several Jewish websites indicates that, in fact, incense and oils are used in some Jewish services. For instance, incense is offered during Yom Kippur. Moreover, oil is central to the feast of Chanukah. The Chanukah Lamp consists of eight branches, with cups on of top of

cards for each holiday that Keefe does not sell; (5) a Jewish newspapers such as the Jerusalem press; (6) proper utensils used in the worship services; (7) a new copy of the Torah in Hebrew; (8) Tallit bag; and (9) depilatory cream. The undersigned now turns to Plaintiff's remaining requests under the broad heading of religious clothing or items.

**1. *Yarmulke/Tallit/Tzizit***

In his prayer for relief, Plaintiff asked permission to wear his yarmulke at all times and to wear other religious clothing such as a tallit, tzizit and yarmulke during administrative or disciplinary confinement. Policy Directive No. 510.00 provides as follows:

> An inmate ordinarily shall be allowed to wear/use personal religious items during formal religious services, ceremonies and meetings, unless the Warden/Administrator determines such items to be a threat to the institution/facility/center security, safety or orderly operation.
>
> 1. Upon request of the inmate and recommendation of the Chaplain /Coordinator or institution/facility/center Religious Services Committee, the Warden/Administrator may allow the wearing/use of certain religious items throughout the institution/facility/center, consistent with considerations of security, safety or orderly operation.

(ECF No. 104-1 at 29).

Defendants respond to this request by noting that Plaintiff wore his yarmulke at all times. In fact, at his deposition, Plaintiff testified as follows:

> Q.: Okay. So right now you wear your yarmulke underneath your ball cap?
> A. Yes, sir.
> Q. And you are allowed to do that?
> A. Again, no, sir, I'm not. I'm not supposed to have it on out of my cell. But, you know, since I've been in this prison, I've never took it off.

(ECF No. 104-1 at 9).

---

each, which are filled with olive oil. *See* http://www.chabad.org. Regardless, Plaintiff must provide these items himself, and to the extent that they require the use of fire, the same would not be permitted due to safety concerns. (ECF No. 104-1 at 17).

Although Plaintiff makes no allegations in his Complaint regarding being disciplined for wearing his yarmulke, in his Response to Defendants' Motion for Summary Judgment, he alleges that he was placed in segregation for wearing his yarmulke. Although his response is not a model of clarity, Plaintiff did attach a form which indicates that on February 28, 2013, the Administrative Segregation Committee reviewed his status and recommended that he remain in his current status of punitive segregation population. E. Seifert, the Warden, upheld the recommendation of the Committee. (ECF No. 105-1 at 8). The attachments provided by Plaintiff did not specify why he was placed in punitive segregation population. However, Plaintiff alleges that it was for wearing his yarmulke.  In their Reply, Defendants had every opportunity to present credible evidence to refute this allegation. However, they did not, and therefore, the undersigned concludes that by wearing his yarmulke at all times, Plaintiff exposed himself to disciplinary proceedings and placement in punitive segregation population. Therefore, it substantially burdened his right to exercise his religious beliefs. *See Holt v. Hobbs*, 135 S.Ct. 853, 861 (2015).

Defendants allege that the WVDOC possesses a compelling governmental interest in maintaining security by not providing Plaintiff's permission to wear his yarmulke at all times. Defendants illustrate this allegation by noting that NCC is classified as a Special Management Facility pursuant to Policy Directive 326.03.  Defendants note that inmates, such as Plaintiff, are sometimes confined at NCC due to safety concerns.  Furthermore, they point to the Policy Directive's provision which provides that the "goal of the Special Management program shall be to return as many Special Management Status inmates as possible to the general population."  To accomplish this task, Defendants maintain that the WVDOC must pay special attention to the safety of inmates which requires a neutral policy regarding the wearing of religious apparel. Accordingly, Defendants maintain that the NCC cannot allow inmates to wear religious apparel among the general

population as such a policy would lead to religious disagreement, gang related activity and a myriad

of other consequences which would all endanger the safety of the inmate population and its staff.

(ECF No. 104 at 25). Defendants provide no support whatsoever for this conclusion.

A review of Policy Directive No. 326.03[16] reveals several pertinent provisions. Specifically:

### III. DEFINITIONS

**Special Management**: Any specific procedure designed to provide for the safety and security of those members of the inmate population who, based on **verified** information, would be in jeopardy from another member or other members of the inmate population. (emphasis in original).

**Special Management Units/Facilities**: The Mount Olive Correctional Complex (Level V) is designated as a facility that houses male, special management inmates within Special Management Units, the Huttonsville Correctional Center (Level V– reviewed/selected) is designated as a facility that houses male, Special Management inmates (who can be reintegrated into the general population) within Special Management Units, and the Lakin Correctional Center (Level V) is designated as a facility that houses female, Special Management inmates within Special Management Units. The Northern Regional Jail and Correctional Facility (Level V) is designated as a Special Management Facility for male Division of Corrections' inmates who can be reintegrated into the general population.

### V. PROCEDURE

E. Special Management Status is a condition of confinement for inmates requesting or requiring a special monitoring or preventive measures that could entail separation from the general population. **Special Management is not a punitive measure** and is used only when no reasonable, safe alternative is available. (Emphasis added).

Nothing contained in the Policy Directive restricts the wearing of religious items by a Special

Management inmate nor abrogate Policy Directive 510.00's provision than an inmate may be

allowed to wear religious items throughout the institution consistent with considerations of security,

---

[16]Defendants did not attach a copy of this Policy Directive. However, the Court was provided a DVD which contains the policy directives of the WVDOC to aid them in evaluating claims filed by inmates placed in the custody of the WVDOC. In addition, this policy can be found on the internet by searching the terms "wvdoc special management."

safety or orderly operation. Again, other than a bald assertion that it would pose a safety concern, Defendants provide no support for their refusal to allow Plaintiff to wear his yarmulke throughout the institution. Significantly, on June 11, 2012, the Central Office Grievance Review addressed Plaintiff's grievance regarding wearing his yarmulka or kippa[17] at all times. Specifically, the Central Office stated:

> This grievance is one in which the inmate alleges that he is an Orthodox Jew and is not allowed to wear his Yarmulke or Kippa at all times. The facility has responded that there is a security interest which is a compelling interest in not allowing him to wear the Yarmulke. Also, while the inmate claims this restriction imposes a substantial burden on the exercise of his faith, he has not set forth where in the Torah (or in the Tanakh) that he is commanded to wear a Yarmulke or Kippa.[18] The inmate may provide such citation within 10 days of this remand.

> This matter is remanded for a more detailed response explaining how the wearing of the Yarmulka or Kippa by the inmate will disturb security or institutional order. Irrespective of whether the inmate supplements his grievance the amended decision shall issue within 10 days here of.

(ECF No. 1-5 at 7).

Wearing a yarmulke is central to the Jewish faith, especially for Orthodox Jews. *See* Rabbi Morris N. Kertzer, What is a Jew? A Guide to the Beliefs, Traditions, and Practices of Judaism that Answers Questions for Both Jew and Non-Jew 91 (1996) ("Most Orthodox Jewish men wear their kippa at all times, not only during prayer...It is their view that they should show respect to God by covering their head, and since God is everywhere, their head should never be uncovered."). Furthermore, religious "emblems" or items may be appropriate under RLUIPA if they "are common

---

[17]Kippa or kippah is also known as a yarmulke or skullcap. http://www.myjewishlearning.com/.

[18]To the extent that the Central Office opines that wearing a yarmulke must be required of Orthodox Jews, it is clearly wrong. The United States Supreme Court recently reiterated that "several provisions of RULIPA underscore its expansive protection for religious liberty. Congress defined 'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'"*Holti*, 135 S.Ct. at 860.

to the members of other umbrella religious groups, easy to recognize, and difficult to abuse as a gang symbol" in contrast to "emblems that are unique to each prisoner and potential security risks." *Kaufmann v. Pugh*, 733 F.3d 692, 699 (4th Cir. 2013).

Based on the foregoing, the undersigned concludes that Defendants have placed a substantial burden on Plaintiff's exercise of his religious rights and have failed to demonstrate that their current policy is the least restrictive means of furthering the compelling prison interest in maintaining a safe and secure environment.

In addition to his request that he permitted to wear his yarmulke at all times, he makes a specific request that he be permitted to wear his yarmulke, tallit and tzitzit[19] during administrative or disciplinary confinement. In response, Defendants have supplied the Affidavit of Brandy Miller, the Associate Warden of Programs at NCC.[20] In it, she states:

> As an inmate at Northern Correctional Center, Mr. Browning was permitted to wear his yarmulke during religious worship services, during study time, and in his cell. The only exception to this provision was if Plaintiff was in administrative or disciplinary confinement.
>
> Any inmate in such confinement is present due to failure to follow a West Virginia Department of Correction's policy. Likewise, any inmate who is in administrative or disciplinary confinement is restricted in what they can wear and possess. Said rule is uniform and applies to all inmates; regardless of religious preferences.
>
> Mr. Browning, and any other inmate, has restrictions placed upon him regarding the wearing of religious clothing, such as tallit, tzitzit, and yarmulke while he is in administrative or disciplinary confinement.

---

[19]"In the Torah there is a commandment to wear "fringes" on the corners of garments. That is, all garments of a certain size or larger, which have at least four corners, must have strings known as tzitzit attached. Since the normal clothing in our time does not have four square corners, traditional Jews wear a garment that is specifically made to have four corners....This is known as the *tallit katan* or tzitzit and is usually worn under the shirt....During prayers the custom is to wear a large rectangular garment with tzitzit (*tallis gadol*) and pray while wrapped in it. *See* http://www.jewishvirtuallibrary.org.

[20]It appears that at the time Plaintiff initiated this action, Brandi Miller was his Unit Manager and Greg Yanke was the Associate Warden of Programs. The undersigned can only surmise that Mr. Yanke is no longer the AWP, and Ms. Miller has been moved to that position.

(ECF No. 104-1 at 16).

The subject of WVDOC Policy Directive 326.00 is Special Management/Punitive Segregation/Administrative Segregation.[21] The Policy defines Administrative Segregation as follows:

"[a] post-hearing custody that is both preventative and reactive in nature. Administrative Segregation is either recommended or not recommended by a Classification Committee following a classification hearing. The recommendation is either upheld or denied by the Warden."

The Policy defines Punitive Segregation as "[a] post hearing custody that is reactive in nature. Punitive Segregation is ordered by a Correctional Officer following a hearing under the policy and procedures governing inmate discipline wherein it has been determined that there is some evidence the inmate committed the rule violation."

According to the Policy, all inmates in segregation shall be provided. . .clothing, that is not degrading and access to basic personal items for use in their cells unless there is imminent danger that an inmate or any other inmates will destroy an item or induce self-injury." Furthermore, the Policy provides that:

> [w]henever an inmate in Segregation is deprived of any usually authorized item or activity, a report of the action shall be filed in the inmate's case record and forwarded to the Associate Warden or Security/Chief/Correctional Office. The report shall identify the inmate, item, or activity deprived of and the reasons for the action...No item or activity shall be withheld for the purpose of punishment or for longer than necessary to ensure the safety and well-being of the inmate and others.

[21]Defendants did not provide a copy of this Policy, and the undersigned can find no reference to it in either Defendants' Memorandum in support of their Motion for Summary Judgment or the exhibits attached thereto. The undersigned acknowledges that the Policy made available to the *pro se* law clerks by the WVDOC is dated June 1, 2014, and the Policy in effect at the time Plaintiff was confined to Punitive Segregation may have contained substantially different provisions. However, the undersigned still is concerned that Defendants have not provided any governmental interest in depriving Plaintiff of his yarmulke while in his cell in Punitive Segregation.

The provision of this Policy, as outlined above, does not support Miller's affidavit and suggests that Plaintiff should be permitted to wear his yarmulke while in Punitive Segregation because he is allowed to wear it in his regular cell. Therefore, without some further explanation, Defendants have not established a compelling governmental interest in depriving Plaintiff of his yarmulke while in Punitive Segregation. With respect to his request to wear his tallit and tzizit, there is nothing in the record to establish that he is not allowed to wear those items in his regular cell. Accordingly, the undersigned has insufficient information from which to determine whether Defendants' are entitled to summary judgment with respect to theses items. Therefore, Defendant's Motion for Summary Judgment as to these issues is denied.

### 2. *Sukkah*

Sukkot is a seven day holiday sometimes referred to as the Season of Our Rejoicing. In honor of the holiday's historical significance, Jews "are commanded" to dwell in a temporary shelter called a sukkah. The commandment to "dwell" in a sukkah can be fulfilled by simply eating all one's meals there. A sukkah must have at least three walls covered with a material that will not blow away in the wind. Another observance important to Sukkot involves the four species: etrog (a citrus fruit native to Israel); lulav (a palm branch); hadas (a branch from a myrtle tree); and arava (a willow branch).[22]

In response to Plaintiff's request for a sukkah, Defendants contend that such a structure is clearly a safety risk because a walled structure in the prison recreation yard could cause conflicts among inmates and promote the exchange of contraband. (ECF 104-1 at 5). The undersigned appreciates Defendants' argument. However, on June 11, 2012, the WVDOC Office of the Commissioner remanded a grievance dealing with, among other things, Plaintiff's request to

---

[22]*See* http://www.jewishvirtuallibrary.org.

construct a sukkah. In remanding the grievance to address the question of a sukkah, the Central

Office noted:

> The inmate does seek to construct a Sukkah on the recreation yard in which to celebrate Sukkot.  It does not appear that the inmate mentions the need for a lulov [sic] and etrog.  A Sukkah is the booth having 3 sides and roofs made of some type of vegetative material. In the modern observance meals are often ate [sic] in the Sukkah and some individuals actually live in the Sukkah.   From a prison management perspective it appears that a Sukkah would create substantially similar security risks to that of a sweat lodge in that it disrupts the operation of the prison yard; it brings in items that could be used as contraband and would require to heighten security to ensure that that [sic] its presence does not create opportunities for assaults.  However, allowing the prisoner the opportunity to possess a lulov [sic] and etrog may be a less restrictive opportunity. Also, the facility needs to identify any specific security concerns created by the Sukkah.[23]

(ECF No. 1-6 at 9).

Nothing in Defendants' memorandum or exhibits establish that the NCC identified any

specific security concerns created by a sukkah or considered any less restrictive means for Plaintiff

to celebrate Sukkot.[24] Therefore, Defendants have not met their burden under RLUIPA.

### 3. *Locker Box*

The Chaplain's office has seven locker boxes for several of the religions represented by

inmates at the NCC. (ECF No. 104 at 5).  The Judaism locker box is shared with Wicca,

Odeinist/Assatru, Native America and Messianic Judaism. Plaintiff requests that one locker box be

designated for the sole use of Orthodox Jews.  Defendants respond that the NCC cannot provide a

---

[23]The undersigned notes that the Central Office capitalized "Sukkah." However, it appears from a review of several websites, that the holiday "Sukkot" is capitalized but not the booth, or "sukkah."

[24]The undersigned notes that the Aleph Institute sends ritual items and holiday packages to institutions for distribution amongst the Jewish prison population including lulav and estrog sets for Sukkot. http://aleph-institute.org/programs/holiday-programs-a-services.html.

locker box for every religion. They maintain that the space is not available for said relief. Additionally, they maintain that more lockers would mean an additional costs to the NCC and such a cost is unnecessary as the religious items for all religions fit within the existing seven locker boxes in the Chapel and the Chaplain's office.[25]

On initial impression, it would appear that Plaintiff's right to exercise his religious rights is not substantially burdened by the fact that a separate locker box is not provided to Orthodox Jews. However, in his deposition, Plaintiff testified that every religion has its own locker box except the four religions that share a box: Judaism, Wicca,[26] Odeinist/Assatru,[27] Native America and Messianic Judaism.[28] Plaintiff further testified that:

> Judaisms, they share with the Opus, which I really do not like, and the – devil worshipers, whatever they are. And I've got a lot of religious books in there, and I've even stopped and told the rabbis to stop sending books in here because if you go over there at any given time, there's pencils or something stabbing the books and that takes the kosher out of them. And they're like, Oh, that's not food. I was, like, Well, it don't have to be food to be kosher or non-kosher.

(ECF No. 104-1 at 12). In addition, Plaintiff testified that the locker boxes are donated from the shop and that there is plenty of room for them. (*Id.*). Given that Plaintiff's testimony suggests that his

---

[25] Because no further information is provided, the undersigned is unclear whether there are locker boxes in both the Chaplain's office and the chapel and/or whether the Chaplain's office is a part of the chapel.

[26] Wicca, as a religion, was introduced by Gerald Gardner in the 1950s. The belief in and use of magic and spellwork is nearly universal within Wicca. *See* http://paganwiccan.about.com.

[27] The undersigned notes that Defendants have provided nothing to define Odeinist/Assatru. Moreover, an internet search provides no simple explanation of this/these religion(s). In the most simplified terms, Asatru and Odinism are part of Germanic neopaganism which is the contemporary revival of historical Germanic paganism. *See* http://en.wikipedia.org.

[28] "A Messianic Jew is a person who was born a Jew or converted to Judaism that believes Yeshua (Jesus) is the Messiah and maintains a Jewish identity and lifestyle. They believe that when a Jew [accepts] the Jewish Messiah they do not become a gentile but rather [they] become[] 'a completed Jew.' Other Jewish people believe the Jews who accept Jesus as the Messiah or converted to Christianity and are no longer Jewish." (ECF No. 106-1 at 17.)

access to religious books has been limited by actions of religious groups that share the locker box with Jews, it appears that Plaintiff's ability to practice his religion has been substantially burdened and Defendants have not demonstrated that requiring these four religions to share a locker box is the least restrictive means of advancing the governmental interests of conserving funds and space. Therefore, Defendants are not entitled to summary judgment on this issue.

**4. *Grooming***

Plaintiff asks that he be allowed to refrain from shaving and cutting his hair, beard or earlocks. In response, Defendants contend that in requiring Plaintiff to cut his hair and shave, they have not violated Plaintiff's rights under RLUIPA. Specifically, Defendants maintain that such requirements are necessary to maintain safety at NCC as long hair and beards would be disruptive, could conceal contraband and could lead to confrontations among inmates. Defendants also cite WVDOC Policy Directive 334.01 which provides as follows:

> Hair length will not exceed the top of the collar or ears, be no more than 3 inches on top and be neat and clean. Hair will have a tapered appearance and may not be blocked.

> Facial hair will not be permitted. Medical and religious issues will be addressed on a case-by-case basis.

(ECF No. 104 at 33-34).

Defendants maintain that due to the unique nature of the NCC being a Special Management Facility, the only exceptions made regarding hair length and facial hair pertain to medical needs. As such, no inmate housed at NCC may deviate from the WVDOC Policy Directive 334.01 for a religious reason. In addition, Defendants contend that due to NCC being a Special Management Facility, the policy exists for security reasons. Defendants maintain that if long hair or beards were permitted, contraband could be concealed in the same. Specifically, they maintain that hair in excess

of three inches could easily be utilized to conceal a short weapon. Furthermore, they argue that hair length and facial hair must be uniform as any variation could lead to a religious disagreement or gang-related activity. Accordingly, Defendants argue that to the extent the grooming policies place a substantial burden on Plaintiff's religious exercise, numerous compelling governmental interests exist such that *Grass*[29] and *Lovelace* dictate that Plaintiff's RLUIPA claim fails as a matter of law.

Since Plaintiff's Complaint and Defendants Motion for Summary Judgment were filed, the United States Supreme Court issued a decision in the *Holt v. Hobbs*, 135 S. Ct. 853 (2015). In *Holt*, a Muslim prisoner brought an action under RLUIPA against the Director of Arkansas Department of Correction and other prison officials challenging the denial of a religious accommodation under the Department's grooming policy[30] to allow a prisoner to grow a half-inch beard. Specifically, Holt sought permission to grow a beard and although he believes that his faith requires him not to trim his beard at all, he proposed a "compromise" under which he would grow only a 1/2-inch beard. The Court agreed that the Department has a compelling interest in stopping the flow of contraband into and within its facilities, but the argument that this interest would be seriously compromised by

---

[29] Defendants are referring to *Grass v. Proctor*, 2010 WL 5203085 (N.D.W. Va. 2010), in which this Court determined that:

> [RLUIPA] prohibits the government from imposing a substantial burden on the religious exercise of a prisoner, unless the defendant can show that the burden (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

Plaintiff, in *Grass*, made various claims regarding the violation of his Eighth Amendment rights with respect to medical care that he was receiving at HCC. In particular, he asserted that he suffered from a skin condition called "PFB" which he maintains was exasperated by the daily close shaving which is required by the WVDOC policy on Inmate Grooming Standards. After Defendants filed dispositive motions, Plaintiff did attempt to amend his complaint to add a claim under RLUIPA. However, he provided no allegation as to how his right to exercise his religious rights had been violated. In fact, the plaintiff did not state to what religion he belonged. For that and other reasons, plaintiff's motion to amend was denied.

[30] The policy in Arkansas provides that "[n]o inmates will be permitted to wear facial hair other than a neatly trimmed mustache that does not extend beyond the corner of the mouth or over the lip." *Holt*, 135 S. Ct. at 860.

allowing an inmate to grow a 1/2-inch beard was hard to take seriously. The Court noted that an item of contraband would have to be very small indeed to be concealed by a 1/2-inch beard and a prisoner seeking to hide an item in such a short beard would have to find a way to prevent the item from falling out. Moreover, the Court found that because the Department does not demand that inmates have shaved heads or short crew cuts, it is hard to see why an inmate would seek to hide contraband in a 1/2-inch beard rather than the longer hair on his head. In conclusion, the Court held that the Department's grooming policy violates RLUIPA in so far as it prevented Holt from growing a 1/2-inch beard in accordance with his religious beliefs.

In the present case, Defendants have not argued that Plaintiff does not have a firmly held religious belief that prohibits him from shaving his beard or cutting his earlocks.[31] Given the ruling in *Holt*, the undersigned finds that Defendants are not entitled to summary judgment on the issue of Plaintiff's request not to shave or cut his beard, hair or earlocks.

### 3. Weekly Worship and Special Holidays

With respect to his claim that he was denied the right to worship weekly and on special holidays, Plaintiff makes the following requests:

1. Proper weekly worship services for Orthodox Jewish Inmates only not a blending of Orthodox Jews and Messianic Jewish inmates;

2. Observe Sabbath each Friday with matzah crackers (challah bread);

3. Observe havdalah each Saturday;

4. Observe Shacharis with tefflin each morning;

---

[31] The Book of Leviticus permits a man to shave the "side, growth of [his] beard." This has been interpreted as the hair on one's head and cheeks. Payot, the curls on the side of a man's head, has become religious custom of the Hasidic and ultra-orthodox. Today, mainly traditional Tuesday not shave their beards. Furthermore, many Jews, who do shave throughout the year, choose to not shave the three weeks prior to Tisha b'Av in a sign of mourning and during the weeks of *Sefirah* (counting of the Omer). It would appear that a man is allowed to shave his beard with scissors, chemical depilatories, or electric razors with two cutting edges. http://www.jewishvirtuallibrary.org/jsource/Judaism/beards.html.

6. Observe Mincha each afternoon;

7. Observe Maariv each evening;

8. Observe all Jewish holidays such as Passover, Rosh Hashanah, Yom Kippur, Simchat, and Torratt Shermini Atzeret.

(ECF No. 1 at 11-12).

The undersigned begins the discussion of Plaintiff's requests under this section by noting that there appear to be ten cities in West Virginia that have Jewish congregations. Only one, in Charleston, appears to be traditional, or Orthodox. Of the remaining nine, seven are Reform[32] and two are Conservative.[33] The only Jewish Congregation within close proximity to the NCC is Temple Shalom, which is Reform and located in Wheeling. According to the Affidavit of Michael Taylor, a volunteer Rabbi comes to the NCC twice a month to lead worship services. (ECF No. 104-1 at 6) Chaplain Taylor states that these services follow the tenants of Orthodox Judaism. (*Id.*). Chaplain Taylor also states that it took nearly three years to find a volunteer Rabbi to come to the NCC. (*Id.*).

With respect to his request for proper weekly worship services, it is clear that providing the same is beyond the control of the NCC. As noted above, a volunteer Rabbi comes only twice a month. The fact that Messianic Jews may be present does not appear to be a substantial burden on Plaintiff's exercise of religion because the uncontroverted Affidavit of Chaplain Taylor establishes that the service follows the tenants of Orthodox Judaism.

In addition, Plaintiff requests to observe the Sabbath each Friday with matzah cracker

_____

[32]"Reform Judaism is the religious movement which arose in early nineteenth century German with the aid of reinterpreting (or reforming) Judaism in the light of Western thought, values and culture where such a reinterpretation does not come into conflict with Judaism's basic principle of faith that the Torah is immutable." http://www.myjewishlearning.com/history.com/history

[33]"Conservative Judaism is the form of the Jewish religion that occupies the middle ground between Orthodoxy and Reform, with its center in the United States, where it is the largest of the three movements..." http://www.myjewishlearning.com/.

(challah bread) and observe Havdalah each Saturday. Sabbath is the English translation of Shabbot or Shabbos and is the Jewish day of rest and seventh day of the week. Of all the Jewish holidays, Shabbat is considered the most important of all – even more important than Yom Kippur or the other High Holidays.[34] In response to Plaintiff's request to observe Sabbath with matzah, the Affidavit of Chaplain Taylor indicates that Plaintiff may purchase or have matzah donated to have with his Sabbath observation. Chaplain Taylor observes that Plaintiff has made no such request. Plaintiff has not challenged Chaplain Taylor's comment and therefore, has provided nothing to support a claim that the NCC has placed a substantial burden on the exercise of his religious beliefs with respect to observing the Sabbath with matzah cracker. The Havdalah ceremony is observed at the end of Shabbot (on Saturday night, when three stars are visible in the sky). Beyond requesting that he be permitted to observe Havdalah each Saturday, Plaintiff provides no explanation as to how the NCC prevented him from doing so.  However, the Affidavit of Chaplain Taylor notes that the Sabbath, as well as Havdalah, require the lighting of candles. (ECF No. 104-1 at 6).  Because of safety concerns, candles are not permitted. It appears that electric bulbs can be used as Shabbat candles where an open flame is not permitted. Plaintiff has not alleged that he has been denied the right to purchase electric bulbs and therefore, he has not demonstrated that NCC placed a substantial burden on the exercise of his religious rights.

Plaintiff also requests that he be permitted to pray three times daily.  There are three daily Jewish prayers: morning (shacharit), afternoon (mincha) and evening (maariv). The undersigned can find nothing in the record which indicates that Plaintiff has been denied the right to say these three daily prayers. The undersigned recognizes that Plaintiff requests that he be permitted to say the

---

[34]*See* http://www.hebrew4christians.com/Holidays/Shabbat/shabbat.html.

Shacharit with tefillin.[35] But because the leather straps attached to the tefillin represent a safety concern, Plaintiff is not permitted to possess tefillin in his cell. (ECF No. 104-1 at 5). Although the inability to possess tefillin in his cell may impose a substantial hardship on Plaintiff's exercise of his religious rights, it is clear that the NCC's interest in securing the safety of Plaintiff, employees and other inmates is a compelling governmental interest and not allowing Plaintiff to possess tefillin in his cell is the only means of furthering that compelling governmental interest.

Finally, Plaintiff seeks to observe all Jewish holidays, such as Passover, Rosh Hashanah, Yom Kippur, Simchat and Torratt Shermini Atzeret. Plaintiff does not indicate in the text of his Complaint what he means by "observing" these holidays. However, the attachments to his Complaint indicate that he has filed several grievances regarding celebrating various Jewish holidays. One grievance deals with Rosh Hashanah (ECF No. 9-5 at 14); one with Yom Hashoah[36] (ECF No. 9-5 at 11); and one with Yom Kippur (ECF No. 9-5 at 19-21). In addition, the record contains the June 11, 2012 memorandum from the Central Office dealing with his desire to construct a sukkah. That memorandum indicated that Plaintiff's grievance also alleged that he was only allowed one feast day and that he was not being allowed to properly celebrate the Jewish feast days. (ECF No. 9-6 at 10).

The Affidavit from Chaplain Taylor indicates that Judaism has more holidays than any other religion. (ECF No. 104-1 at 6). Accordingly, Chaplain Taylor notes that it is difficult for the volunteer Rabbi to come to the NCC for all Jewish holidays. (*Id.* at 6-7). In addition, Chaplain

---

[35] Tefillin are two small black boxes with black straps attached to them. Jewish men are required to place one box their head and tie the other on their arm each weekday morning. *See* http://www.jewishvirtuallibrary.org/jsource/Judaism/tefillin.html.

[36]The full name of the day commemorating the victims of the Holocaust is "*Yom Hashoah Ve-Hagevurah.*" http://www.jewishvirtuallibrary.org/jsource/Judaism/yomhashoah.html.

Taylor indicates that at no time is Plaintiff denied the right to celebrate Jewish holidays. (*Id.*).

However, Chaplain Taylor then continues by stating that:

> Every religion at the [NCC] can select one holiday to celebrate each year. This requires Mr. Browning and any other Jewish inmates to agree on one holiday each year upon which to feast. In past years, Mr. Browning wished to celebrate Rosh Hashanah while the other Jewish inmate at the [NCC] wanted to celebrate Passover.
>
> Accommodations were made for Mr. Browning to feast once a year as I arranged for the Aleph Institute to send food to Mr. Browning to celebrate Passover. As with any inmate, Mr. Browning would have to pay for this accommodation or find someone to pay for the same. Mr. Browning never paid for the same and never found a donor to assist in his celebration of any Jewish holiday.

(ECF No. 104-1 at 7).

Chaplain Taylor's Affidavit is inconsistent with a fair reading of Policy Directive 510.00, the subject of which is Religious Services. (ECF No. 104-1 at 23-30). Contained within this Policy Directive is the following:

> C. Chaplains/Coordinators shall endeavor to facilitate the observance of important religious holidays/celebrations that do not coincide with legal holidays.
>
> > 1. He/she will facilitate such an observance in accordance with specific requirements of a faith group (i.e., fasting, worship, diet, work, etc.).
> >
> > 2. The inmate must initiate a request for observance of a religious holiday. Valid documentation of requirements may be requested.
> >
> > 3. The Chaplain/Coordinator will verify the specific religious requirements involved.

(ECF No. 104-1 at 27).

The June 11, 2012 memorandum from the Central Office concerns Plaintiff's grievance that he is allowed only one feast day and is not being allowed to properly celebrate the Jewish feast days. The memorandum indicates that the seven major feasts of Israel are "Pesach or Passover; Chag Hamotzi or Unleavened Bread; Yom Habikkurim or First Fruits; Shavu'ot or Pentecost; Yom

Teru'ah or Trumpets also called Rosh Hoshanna; Yom Kippur or Atonement and Sukkor or Tabernacles plus two minor feasts of Purim and Hanukkah." (ECF No. 9-6 at 10). Given that the WVDOC recognizes that there are seven major feasts in the Jewish religion, restricting Plaintiff to celebrating but one is a substantial burden on his religious beliefs. Accordingly, the undersigned does not believe that Defendants have demonstrated a compelling governmental interest in allowing Plaintiff to select only one holiday to celebrate.

### 4. Eleventh Amendment

Defendants note that Plaintiff has filed suit against seven individuals, all of whom were employees of the WVDOC when the Complaint was filed. Defendants note that it cannot be disputed that the WVDOC is a state agency. Therefore, Defendants maintain that they are entitled to Eleventh Amendment immunity with respect to Plaintiff's claim for monetary damages.

As previously indicated, Defendants contended in their Motion to Dismiss filed on May 2, 2013 that the Eleventh Amendment precluded suit against state officials. Magistrate Judge Seibert determined that this argument failed and in addition to recommending that Defendants' Motion to Dismiss be denied, Magistrate Judge Seibert also ordered counsel to file a written memorandum explaining how the Eleventh Amendment immunity applies to this action filed in federal court. The Memorandum and Objections to the R&R were filed on February 10, 2014. In its Order adopting the R&R, the District Court specifically addressed Defendants' argument that the Magistrate Judge improperly concluded that they are not entitled to Eleventh Amendment immunity in this action. After a thorough discussion, the District Judge determined that "the magistrate judge correctly concluded that the defendants are not protected by the Eleventh Amendment." (ECF No. 71 at 10).

"[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case."

*United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (alteration in original). However, "a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms Inc.*, 326 F.2d 505, 514-15 (4th Cir. 2003).

In this instance, the undersigned finds nothing in Defendants' current argument regarding Eleventh Amendment immunity that would warrant the District Court to reconsider or modify its earlier decision that Defendants are not protected by the Eleventh Amendment. The only new argument presented by Defendants is that in his deposition Plaintiff failed to articulate any actions taken by these Defendants in their individual capacities. A review of Plaintiff's testimony simply indicates that he is a *pro se* litigant, who was being asked questions by a trained legal professional and was unable to articulate an answer to the question "how did any of the defendants engage in their individual capacity?" (ECF No. 104-1 at 14-15). Such inability does not alter the reasoning set forth in depth in the Court's decision that Defendants are not protected by the Eleventh Amendment.

### 5. Qualified Immunity

Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In assessing whether qualified immunity is available to Defendants, the undersigned has applied the two-step analysis set forth by Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

First, consideration must be given to whether the facts alleged, taken in the light most favorable to Plaintiff, show that Defendants violated Plaintiff's statutory rights under RLUIPA.

Plaintiff satisfies this part of the test as established by the previous discussion in this R&R. Second, consideration must be given to whether these statutory rights were clearly established at the time of the claimed violation. *See id*. For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 634, 640 (1987).

RLUIPA was enacted in September 2000; the alleged violations set forth in Plaintiff's Complaint began more than eight years later. However, the question still remains whether a reasonable prison official should have known that the conduct attributed to these Defendants violated Plaintiff's free exercise rights under RLUIPA. The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Although "[a] prior case holding identical conduct to be unlawful is not required" for the right the clearly established, the unlawfulness of the conduct must be "manifest under existing authority." *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998); *see also Hope v. Peizer*, 536 U.S. 730, 739 (2002).

As noted earlier, RLUIPA incorporates and exceeds the Constitution's basic protections of religious exercise. Under RLUIPA, a prisoner has a clearly established right to exercise his religion without the government imposing a substantial burden on that right unless the government demonstrates that the burden is in furtherance of a compelling state interest and is the least restrictive means of compelling that interest. Here, because the facts support an inference that Defendants acted intentionally in depriving Plaintiff of some of his free exercise rights, they are not entitled to summary judgment on qualified immunity grounds.

## V.  RECOMMENDATION

For the reasons stated herein, the undersigned **RECOMMENDS** that **Defendants' Motion**

for Summary Judgment (ECF No. 103) be **GRANTED IN PART AND DENIED IN PART.**

Specifically, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** with respect to Plaintiff's claims regarding:

(1) kosher meals prepared at the NCC before Plaintiff's transfer to MOCC;

(2) a requirement that the Keefe store list be adjusted to specify kosher foods and sell kosher meats, breads, soups, juice or soda;

(3) the provision of herbs, oils or incense, prayer shawls, candles and a menorah, Jewish holiday cards, Jewish newspapers, proper utensils for worship services, a new copy of the Torah in Hebrew, a tallit bag and depilatory cream;

(4) weekly worship services;

(5) observing the Sabbath with matzah crackers (challah bread);

(6) observing Havdalah; and

(7) praying three times daily.

and be **DENIED** regarding his claims:

(1) with respect to injunctive relief in regard to kosher meals served at any WVDOC facility;

(2) to purchase kosher foods from the state vendor or a private vendor;

(3) have a microwave for Jewish inmates to stay kosher;

(4) for permission to wear his yarmulke at all times;

(5) for permission to wear his yarmulke/tallit/tzizit in administrative or punitive segregation;

(6) to have a sukkah booth each year;

(7) for a locker box designated for Jewish material;

(8) to refrain from shaving his beard or cutting his hair and earlocks;

(9) to observe the Jewish holidays.

Finally, the undersigned **RECOMMENDS** that Plaintiff's Motion for Subpoenas (ECF No. 111) be **DISMISSED WITHOUT PREJUDICE**.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objections are made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. The Court further directs the Clerk of the Court to mail a copy of this Report and Recommendation to the *pro se* Plaintiff, by certified mail, return receipt requested.

**DATED:** February 11, 2015

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE